In accordance with the foregoing Memorandum Opinion and the reasons set forth therein, it is hereby

Ordered, adjudged and decreed:

(1) That plaintiff Gilliard Mathurin be awarded by the Government of the Virgin Islands the sum of $500.00;

(2) That plaintiff Gilbert Sampson be awarded by the Government of the Virgin Islands the sum of $500.00;

(3) That plaintiff Walcott Steele be awarded by the Government of the Virgin Islands the sum of $500.00; and

(4) That all parties to this litigation pay their own attorney's fees.

**PUERTO RICO MARINE MANAGEMENT INC., and Marine Transportation Management, Inc. of Puerto Rico, Plaintiffs,**

v.

**INTERNATIONAL LONGSHOREMENS' ASSOCIATION, AFL–CIO, et al., Defendants.**

**Civ. No. 75–387.**

United States District Court, D. Puerto Rico.

May 20, 1975.

Rafael Cuevas Kuinlam, Cancio, Cuevas & Mayo, Santurce, P. R., for plaintiffs.

Demetrio Fernandez and Nicolas Delgado Rio Piedras, P. R., for defendants.

## DECISION AND ORDER

TORRUELLA, District Judge.

This matter is before us on a Complaint requesting injunctive relief pursuant to Section 301(a) of the Labor Management Relations Act,[1] 29 U.S.C. § 141 et seq. and *Boys Markets, Inc. v. Retail Clerk's Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). An order to show cause issued and thereafter a hearing was conducted to determine whether a preliminary injunction should issue against Defendants.

Defendants, who are labor organizations representing employees in an industry affecting interstate commerce, have moved to dismiss for lack of jurisdiction alleging that Plaintiffs are not "employers" within the meaning of Section 301(a). This term is defined in Section 2(2) of the Act, 29 U.S.C. § 152(2) as follows:

"  .  .  . '[E]mployer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include  .  .  .  any State or political subdivision thereof  .  .  ."

We are thus charged with making an initial inquiry into the nature of Plaintiffs and their relationship, if any, to "any State or political subdivision thereof."

---

1. Section 301(a) is found at 29 U.S.C. § 185 (a) and reads in its pertinent parts as follows:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter,  .  .  . , may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

Plaintiff Puerto Rico Marine Management, Inc., hereinafter called "Management", is a Delaware Corporation organized in August, 1974. It is a wholly-owned subsidiary of McLean Industries, Inc. All of its stock is privately held and none of it is owned by any public corporation or governmental entity.[2] All officers of Management are appointed by its Board of Directors, who in turn is elected by the stockholders. No officer or member of the Board is a publicly elected or appointed official.

Management has a wholly owned subsidiary called Puerto Rico Marine Operating Company, Inc., hereinafter called "Operator", which although not a party Plaintiff, because of its close relationship to Management as will be seen shortly, should also be commented upon. All of the above concerning Management related to incorporation, ownership, officers, board of directors and similar matters is substantially applicable to Operator, as well as to the other Plaintiff, Marine Transportation Management, Inc. of Puerto Rico, hereinafter called "Transportation", and also to two additional wholly-owned subsidiaries, Trans Ocean Transportation Executives Management, Inc. and Puerto Rico Marine Services, Inc., hereinafter called "Trans Ocean" and "Services" respectively. It seems, but is unclear from the record, that Transportation, Trans Ocean and Services are subsidiaries of Transamerican Trailer Transportation, Inc., a holding company similar to McLean Industries, Inc., but in any event that conclusion is unimportant to the decision of this matter.

As will be seen hereafter, notwithstanding what is stated in the certificates of incorporation of Management, Operator, Transportation, Trans Ocean

and/or Services, the sole business of these companies is to act as agents for the Puerto Rico Maritime Shipping Authority, hereinafter called the "Authority", in carrying out different phases of an ocean common carrier operation.

The Authority is a public corporation of the Commonwealth of Puerto Rico created by virtue of Law No. 62 of June 10, 1974. The purpose of this entity is to provide ocean common carrier transportation between Puerto Rico and the exterior. To comply with said purpose the Authority purchased or leased the facilities of several private carriers engaged in said business, including ships, trailer vans, shore installations, terminals and related facilities.

Law No. 62 refers to the Authority as an instrumentality of the Commonwealth of Puerto Rico. It is directed by a board of directors appointed by the Governor with the consent of the Senate. The Authority has the power of eminent domain. Its income, property and bonds are exempt from taxation. The interest paid by the Authority on said bonds is guaranteed by the Commonwealth of Puerto Rico up to the amount of $60,-000,000. The Authority's yearly net income enters into the general funds of the Treasury of the Commonwealth. The Authority is required to report annually to the Governor and Legislature.

■ It can not be seriously disputed but that the Authority is a political subdivision of the Commonwealth of Puerto Rico,[3] and as such not an "employer" within the meaning of the Statute here in question. *NLBR v. Natural Gas Utility District*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971); *NLRB v. E. C. Atkins & Co.*, 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947); *NLRB v. Natchez Trace Electric Power*

---

2. Any reference to "public corporations", "governmental entity" or similar terminology shall be taken to mean in relation to the Commonwealth of Puerto Rico, which we understand to be within the scope of " . . . State or political subdivision thereof . . ." for purposes of the Statute here in question. See *Calero-Toledo v. Pearson Yacht Leasing*

*Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); cf., *Cosentino v. ILA*, 126 F. Supp. 420 (D.C.P.R., 1954).

3. We make special note of the fact that we are dealing here with a labor relations situation, and are not deciding this issue for other purposes.

*Assoc.,* 476 F.2d 1042 (CA 5, 1973); *NLRB v. Randolph Electric,* 343 F.2d 60 (CA 4, 1965).

The issue, however, is whether the relationship between the Authority and Management, and the other related companies, is such as to affect their status as employers within the statutory scheme of the Labor-Management Relations Act, *supra.* To determine this question we must look at this relationship in some detail.

On July 1, 1974, Management and Operator entered into a so-called "management services contract" with the Authority, whereby the former became exclusive agents of the later for the commercial management and operation of ocean carriage sevice between Puerto Rico and the East Coast and Gulf Coast of the United States.[4] Under this agreement the Authority provided all the assets necessary for this operation including the vessels, equipment and terminals. The agents are to operate "in accordance with such directions as may from time to time be given" by the Authority. The Authority is "responsible for developing and promulgating the policy governing the operation and utilization" of the facilities in the service. It is the duty of Management, "subject to the policies determined by the Authority", to be charged with full responsibility for the maintenance, repair, marketing, sales and related systems and operation of the facilities. Management, as

agent for the Authority and as directed by it, must abide by tariffs promulgated by the Authority, which retains the ultimate responsibility for all amendments and changes and has an absolute right to veto or reject any tariff amendments or charges proposed by Management. Both Management and Operator, for the account of Authority, are to supervise and perform all matter of duties regarding the operation, including the making of contracts on behalf of the Authority for the transportation of goods. Operator is to employ all the operating personnel, including stevedoring personnel, but in so acting both Management and Operator are to "adhere to policies established by the Authority." Among these are that the service "be operated in such manner as to avoid and eliminate inefficient or wasteful transportation practices"[5] and certain personnel hiring practices.[6] Management is to report to the Authority "at such times and in such forms" as may be required by the Authority. Initial budgets setting out the capital requirements and costs and expenditures of Management and Operator have to be submitted for approval by Authority, who may then "appropriate and pay over the Management Company such amounts as may be approved by the Authority as working capital and start up costs." Annual budgets are to follow similar procedures and cash shortages are to be covered by the Authority after appropriate supplemental budgets are justified by Man-

---

4. It is interesting to note that at this time neither Management nor Operator had corporate existence.

5. This commendable goal is the basis of the present labor dispute which deals with work practice rules.

6. The following clause appears on Pages 9 and 10 of the Agreement:
   "c. The Management Company and the Operating Company will, to the extent permitted by law, exert their best efforts to recruit and train Puerto Rican personnel for positions of responsibility. Without the express written consent of the Authority, the Management Company and the Operat-

ing Company shall not employ or otherwise retain personnel who continue to be employed by any other entity involved in the ocean shipping industry. It is anticipated that, to the extent permitted by law, all of the operating personnel in Puerto Rico shall be Puerto Rican and substantially all of the Executive Personnel in Puerto Rico shall be Puerto Rican. For purposes of this paragraph a Puerto Rican person shall be deemed to include a citizen of the United States who has resided in Puerto Rico for the last five years."
Nothing contained herein shall be deemed as passing upon the validity of this provision. Cf. *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973).

agement, and approved by the Authority. All revenues are to be collected by Management for the account of the Authority and so held in trust in such banks as the Authority directs. Accounting procedures acceptable to the Authority are to be established. Any excess of revenues over expenditures are to be paid over to the Authority on a quarterly basis. The Authority has the right at any time to inspect the records and books of Management and Operator. Independent auditors are engaged by the Authority and the internal auditors are employees of the Authority. The Authority has "the final decision as to the risks to be insured against, the amount and condition of such coverage, and the insurers." The Authority reserves the power to make contracts by which it will be bound, but can delegate to Management the power to enter into contracts binding the Authority up to the amount of $50,000. Masters of vessels employed by Operator bind the *Authority* as is customary for masters of vessels in the United States Merchant Marine. Any transaction between Management and its parent company must first be approved by the Authority. A complicated formula is established for compensation of Management. Suffice it to say that this is a fee for services which can be increased by certain factors bearing on the efficiency of the operation, but which has a minimum which is independent of profit or loss. There is an arbitration provision for settlement of disputes between the parties. Without the express written permission of the Authority, neither Management nor Operator can in any way dispose of or sell any property used in the service, nor engage in any business other than the operation of these facilities, nor engage in any transaction other than what is required by the management services contract. Any employment contract between Management and Operator with an annual salary of $35,000 or more is subject to review by the Authority. The headquarters of Management and Operator must be lo-

cated in San Juan, Puerto Rico. The remaining portions of this agreement deal with certain mutual warranties of the parties, contractual remedies and other matters which we do not deem pertinent to the issues at hand.

On or about October 1st, 1974 the Authority entered into another "management services contract" with Transportation and Trans Ocean whereby they became the Authority's agent in the management and operation of ocean common carriers service between Puerto Rico and the East Coast of roll-on roll-off vessels and related equipment. This contract is substantially similar to the one previously described covering Management and Operator and need not be discussed in detail. One important area of variance is that this new contract provides for a so called "Joint Management Committee" wherein the parties work towards the centralization of such functions as marketing, sales, cargo allocation and booking, billing, accounting, insurance, equipment control and dispatch, and pricing. The Authority, however, retains the right to make "the final decisions regarding any centralization and combination", and any of these functions can be "assigned to any agent of the Authority or to the Authority itself." Another important provision that is at variance with the Management-Operator Agreement is a clause whereby the Authority "guarantee[s] employment of the present employees of Transamerican Trailer Transport, Inc., for a period of at least one year." Lastly, there are prohibitions against merger, consolidation, transfer of stock or assets by Transportation or Trans Ocean, and the right of the Authority to purchase their stock upon the expiration of the agreement in accordance with a predetermined formula. These provisions must be imprinted on the stock certificates of Transportation and Trans Ocean.

On November 8, 1974 in furtherance of the management services contract, the executive director of the Authority, Mr.

Esteban Dávila, subscribed a power of attorney on behalf Mr. G. P. Toomey in his capacity as President of Management, to enable Management to "act as an instrumentality of the Authority in the performance by the Authority" of the duties imposed upon it by the previously-mentioned Law No. 62. This document constitutes a protocolization pursuant to Puerto Rican Law [7] of the agency powers previously agreed to in the management services contract.

Although there is no such similar document in evidence as regards Plaintiff Transportation, we take note of the fact that Paragraph 3 of its management services contract contains a provision for such document, which is identical to the stipulation to that effect contained in Plaintiff Management's contract. We shall attribute the failure to introduce the same, if it exists, to an inadvertent oversight. It is not necessary for the findings we make herein.

Sometime in December, 1974 Management entered into a collective bargaining contract with Defendant International Longshoremen's Association Local 1575, AFL–CIO, hereinafter called "Local 1575", covering a unit composed of the employees engaged in the handling, loading and unloading of its vessels in all the parts of Puerto Rico. Simultaneously, a similar contract was entered into between Transportation and Local 1575.

Both contracts contain addenda which read as follows:

"The Puerto Rico Maritime Shipping Authority and/or its agents recognize and guarantee this Collective Bargaining Agreement."[8]

The addenda were subscribed by Mr. Frank Ramos, an attorney who is the executive director of the Authority. They were signed at the same time as the original contractors.

The negotiations for this contract took place mostly in New York. Mr. Toomey was one of the members representing management. Although there is conflicting evidence on this point, it appears that the Authority's Mr. Ramos was present during the negotiation meetings, apparently as a silent if not uninterested spectator. There is also credible evidence to the effect that Mr. Esteban Dávila, the Authority's President, was present during one joint session and that he also met with the employer caucus on several occasions. Both Mr. Dávila and Mr. Ramos privately met with Union officials on several occasions regarding the issues then pending.

Any further addition to this long-winded statement of the facts is unnecessary as those mentioned are sufficient for the purposes of a decision of the issue at bar. Irrespective of what analysis we apply to this situation we are required to conclude that Plaintiffs are not "employers" within the meaning of 29 U.S.C. § 152(2) and that this Court lacks jurisdiction in this case.

No further detailed perusal is required to conclude that there exists an agency relationship between Plaintiffs and the Authority. Not only is this relationship openly recognized and labeled as such by Plaintiffs and the Authority, but the facts clearly support such a legal conclusion.

As agents of the Authority, Plaintiffs are acting not on behalf of themselves but on behalf of their principal, the Authority. See Restatement of Law of Agency, Vol. 1, Sec. 39 2 Am.Jur. 14; *Siniscal v. United States*, 208 F.2d 406, (CA 9, 1953); 31 L.P.R.A. § 4421, *López Landrón v. Registrar*, 15 P.R.R. 703 (1909). Thus, the employees of Plaintiffs are, for the present purposes, the employees of the Authority. *Roane-*

---

7. 4 L.P.R.A. § 922.

8. The following words continue, but are crossed off and initialled:

. . . "once the subscribing company and/or its assets have been acquired." We consider them not to be part of the contracts.

*Anderson Co.*, 95 NLRB 1501 (1951) cf. *NLRB v. Howard Johnson Co.*, supra; *NLRB v. Carroll*, 120 F.2d 457 (CA 1, 1941).

In the alternative, the record most assuredly supports a finding under Federal Law[9] that Plaintiffs are a "political subdivision" of the Commonwealth of Puerto Rico within the meaning of 29 U.S.C. § 152(2). All assets, including working capital, are provided by the Authority; policy and directive is established by the Authority, including in the vital area of labor relations; tariff development and promulgation lays with the Authority; fundamental personnel hiring practices and goals are promoted by the Authority;[10] Plaintiffs' excess of revenues over expenditures are paid over to the Authority which in turn transfers them into the Commonwealth's Treasury;[11] Plaintiffs "act as an instrumentality of the Authority"; Plaintiffs are administered by individuals who are responsible to public officials. *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971). There is such control and power by the Authority over Plaintiffs, that they are merely the alter ego of the Authority, a political subdivision of the Commonwealth of Puerto Rico. Plaintiffs are thus outside the jurisdiction of this Court for purposes of 29 U.S.C. § 185 (a).[12]

In view of the above, the Petition for a Preliminary Injunction is hereby denied.

It is so ordered.

---

9. *N L R B v. Randolph Electric Membership Corp.*, 343 F.2d 60 (CA 4, 1965).

10. We are not unaware that Plaintiffs do the actual hiring, firing, and disciplining of employees, factors that usually are considered controlling in these situations. *N L R B v. Howard Johnson, Co.*, 317 F.2d 1 (CA 3, 1963), cert. den. 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963) cf. *N L R B v. Jewell Smokeless Coal Corp.*, 435 F.2d 1270 (CA 4, 1970). However, we consider these indicia not to be decisive under the present circumstances. *Southwestern Bell Telephone Co.*, 50 NLRB 702 (1943).

11. *Cf. Krisel v. Duran*, 258 F.Supp. 845, 849 (D.C.N.Y., 1966), affirmed 386 F.2d 179 (CA 2, 1967), cert. den. 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968).

12. *Cf. Puerto Rico Telephone Company*, 24th Region NLRB Case No. 24–RC–5524, decided February 20, 1975.