**Raymond CRILLY, Appellant,**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY and United Transportation Union, Local 1594.**

**No. 75–1528.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 29, 1975.

Decided Jan. 14, 1976.

As Amended Feb. 18, 1976.

Elizabeth M. McKenna, O'Brien & O'Brien, Philadelphia, Pa., for appellant.

J. Freedley Hunsicker, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for appellee.

Before BIGGS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This appeal is from an order entered by the United States Court for the Eastern District of Pennsylvania dismissing plaintiff's complaint for lack of subject matter jurisdiction. Appellant Raymond Crilly, a bus driver, sued his employer, Southeastern Pennsylvania Transportation Authority (SEPTA), and his union, United Transportation Union Local 1594 (Local), alleging that SEPTA had discharged him in breach of the collective bargaining agreement between the defendants, and that the Local had breached its duty of fair representation by failing to pursue his grievance to arbitration.

Crilly contends that the district court had jurisdiction over his case by

virtue of § 301(a) of the Labor Management Relations Act (Taft-Hartley Act), 29 U.S.C. § 185(a).[1] SEPTA does not seriously dispute that its operations would, if conducted by a private entity, subject it to federal jurisdiction under § 301(a).[2] SEPTA's transportation network is partly in interstate commerce and certainly affects interstate commerce[3] as those terms of art are defined in §§ 2(6) and 2(7) of the National Labor Relations Act (Wagner Act), 29 U.S.C. §§ 152(6) and 152(7), and §§ 501(1) and 501(3) of the Taft-Hartley Act, 29 U.S.C. §§ 142(1) and 142(3). SEPTA, however, contends that it is a political subdivision of the Commonwealth of Pennsylvania and therefore excluded from the definition of employer as that term is defined in § 2(2) of the Wagner Act, 29 U.S.C. § 152(2), and § 501(3) of the Taft-Hartley Act, 29 U.S.C. § 142(3).[4] Moreover, SEPTA argues that since it is not an employer under either Act, Local 1594 representing its employees is not a labor organization for the purposes of § 301(a), for that term of art defined in § 2(5) of the Wagner Act, 29 U.S.C. § 152(5), and § 501(3) of the Taft-Hartley Act, 29 U.S.C. § 501(3), is also dependent upon the definition of employer.[5]

After careful consideration of the interrelationship between the definition sections of the Wagner and Taft-Hartley Acts, we hold that the district court was correct in dismissing Crilly's complaint for lack of subject matter jurisdiction. We find that SEPTA is a political subdivision of the Commonwealth of Pennsylvania and therefore excluded from the coverage of both Acts. We reach this decision even though coverage of state and local government employees might be consistent with the dominant purposes of the Taft-Hartley Act. In view of the limited evidence and strong inferences that do exist regarding congressional intent behind the cross referencing of the definition sections, however, we cannot find such coverage. Moreover, the extension of coverage is a legislative not a judicial function, and we note that Congress is presently considering the matter.[6]

1. Section 301(a) provides that:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

2. Since SEPTA does not, except for one bus route, utilize Certificates of Public Convenience and Necessity issued by the Interstate Commerce Commission, it is not, with respect to Crilly's claim, subject to the provisions of the Railway Labor Act, 45 U.S.C. §§ 151–88. Thus, the exemption in § 212 of the Labor Management Relations Act, 29 U.S.C. § 182, for "any matter subject to the provisions of the Railway Labor Act" is not applicable.

3. SEPTA's service area includes at least one interstate bus route from Philadelphia to Trenton. Moreover, it is clear that a disruption of SEPTA's operations upon which many Delaware and New Jersey residents depend for interchange purposes would burden or obstruct commerce, even if they did not involve interstate transportation routes. *See, e. g. N.L.R.B. v. Fainblatt*, 306 U.S. 601, 59 S.Ct. 668, 83

L.Ed. 1014 (1939); *N.L.R.B. v. Dixie Terminal Co.*, 210 F.2d 538 (6th Cir. 1954).

4. Section 501(3)'s definition of employer incorporates by reference the definition contained in § 2(2) of the Wagner Act, 29 U.S.C. § 152(2). Possible difficulties with this cross reference are discussed *infra*.

5. It should also be noted that the definition of employee in § 2(3) of the Wagner Act, 29 U.S.C. § 152(3), is dependent upon the definition of employer. Thus, if SEPTA is not an employer for the purposes of the Act, the Local's members cannot be employees, and there is no federal jurisdiction over either the fair representation or the breach of contract claims.

6. Hearings are presently being conducted by the ninety-fourth Congress on two House Bills on this subject. H.R. 77, introduced by Congressman Frank Thompson, provides that "employees of States and political subdivisions thereof shall be subject to the provisions of the National Labor Relations Act." H.R. 1488, introduced by Congressman Edward Roybal, provides for a separate legal structure and enforcement apparatus for public employees modelled in large part after the Wagner and Taft-Hartley Acts. These proposals are identical to S. 3294 and S. 3295 introduced in the Senate during the ninety-third Congress.

## I. IS SEPTA A POLITICAL SUBDIVISION OF THE COMMONWEALTH OF PENNSYLVANIA?

In *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1970), the Supreme Court determined that federal rather than state law governs the issue whether or not an entity is a political subdivision of a State for the purposes of the Taft-Hartley Act, and therefore adopted a definition which had previously been formulated by the National Labor Relations Board.[7] According to the Board, an entity was a political subdivision if it was "either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." 402 U.S. at 604-05, 91 S.Ct. at 1749.

■ SEPTA was created by an act of the state legislature as an "agency and instrumentality" of the Commonwealth to "exercise . . . public powers", including that of eminent domain. Metropolitan Transportation Authorities Act of 1963, as amended, 66 Pa.Stat.Ann. § 2001 *et seq.* (Supp.1975). It is governed by a Board of Directors composed of an *ex officio* member appointed by the Governor of Pennsylvania, two members from each of the five counties in its designated service area—Bucks, Chester, Delaware and Montgomery—who are appointed by their respective county commissioners, and two members appointed by the Mayor of Philadelphia with the approval of the City Council. 66 Pa. Stat. § 2016(a)(1). Thus, SEPTA falls squarely within the meaning of public subdivision as that term is used in § 2(2) of the Wagner Act.

## II. ARE STATE POLITICAL SUBDIVISIONS ENGAGED IN BUSINESSES AFFECTING INTERSTATE COMMERCE, AND THE LABOR ORGANIZATIONS REPRESENTING THEIR EMPLOYEES, EXCLUDED FROM COVERAGE BY THE LABOR MANAGEMENT RELATIONS ACT?

■ The Wagner Act, enacted in 1935 as a measure to salvage much of § 7(a) of the defunct National Industrial Recovery Act, 48 Stat. 198 (1933), guaranteed employees the right to organize and bargain collectively, and proscribed certain employer anti-union activities. Section 2(2) of that Act defined employer but excluded from coverage "any State or political subdivision thereof." 29 U.S.C. § 152(2).[8] In 1947 Congress passed the Taft-Hartley Act which included five titles. Title I reenacted the Wagner Act with extensive revisions. The definition of employer in Title I, insofar as it excluded states and their political subdivisions from coverage, was not changed. Title I of the Taft-Hartley Act is still commonly referred to as the National Labor Relations Act, and is enforced primarily by the National Labor Relations Board. Titles II through V of the Taft-Hartley Act were entirely new, and are commonly referred to as the Labor Management Relations Act. Title V of this Act contained its own definitions. Section 501 states that:

When used in this Act—[9]

---

7. The term political subdivision is not defined in either the Wagner Act or the Taft-Hartley Act. The definition adopted by the Supreme Court had been initially formulated by the NLRB in *Randolph Electric Membership Corp.*, 145 NLRB 158, 54 LRRM 1322 (1963), and *Tri-County Electric Membership Corp.*, 145 NLRB 810, 55 LRRM 1057 (1964), both enforced *sub nom. NLRB v. Randolph Electric Membership Corp.*, 343 F.2d 60 (4th Cir. 1965).

8. When the Wagner Act was passed there were approximately 2.7 million men and women working for state and local governments. Today, mirroring the profound changes in the functioning of state and local governments as well as the magnitude of services they are expected to provide, more than 11½ million workers are employed in these branches of the public sector. Hearings on S. 3295 and S. 3294 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 93rd Cong., 2d Sess., at 1 (1974) (statement of Senator Harrison J. Williams) [hereinafter *Senate Hearings* ].

9. In the United States Code Annotated some confusion is created regarding the applicability of § 501 to other titles of the Taft-Hartley Act because the opening clause reads: "When used in this chapter . . . ." 29 U.S.C. § 142.

(1) The term "industry affecting commerce" means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce.

(2) The term "strike" includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees.

(3) The terms "commerce", "labor disputes", "employer", "employee", "labor organization", "representative", "person", and "supervisor" shall have the same meaning as when used in the National Labor Relations Act as amended by this Act.

Section 501(3) cross references the definition of employer for purposes of the Labor Management Relations Act to the definition of employer in the National Labor Relations Act, § 2(1). The cross reference, applied literally, suggests that political subdivisions of states are excluded from coverage under either act.

While we could conclude our analysis at this point if the definitions of the Wagner Act were clearly intended to be literally applied to suits under the Taft-Hartley Act, several significant decisions have cautioned that literalism may not be the appropriate canon of statutory construction. *See, e. g. United States v. Ryan*, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1950). *Contra, Puerto Rico Marine Management, Inc. v. Internat'l Longshoremen's Ass'n, AFL–CIO*, 398

F.Supp. 118 (D.P.R.1975).[10] Supervisors, for example, had not been mentioned in the original definition of employees in § 2(3) of the Wagner Act, 29 U.S.C. § 152(3). Section 501(3) of the Taft-Hartley Act cross references the definition of employee to § 2(3) of the Wagner Act. Among the amendments to that Act included in Title I of the Taft-Hartley Act was a redefinition of employee expressly excluding supervisors.[11] If the cross reference was read literally, supervisor unions would fall outside the provisions of the Labor Management Relations Act, in particular the emergency strike injunction provisions of § 208, 29 U.S.C. § 178. In *United States v. National Marine Eng'rs Beneficial Ass'n* (MEBA), 294 F.2d 385 (2d Cir. 1961), Judge Friendly concluded that supervisors were excluded from coverage under the Wagner Act but that Congress intended that they be covered by the Taft-Hartley Act despite the cross reference in § 501(3). Holding that the district court properly applied § 208(a) to end a national emergency supervisor strike, the Second Circuit reasoned that if a literal application of a statute led to a result plainly at variance with the clear legislative purpose, the literal meaning must yield to the legislative purpose. 294 F.2d at 385, 393. In *Dente v. Int'l Organization of Masters, Mates and Pilots*, 492 F.2d 10 (9th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974), the Ninth Circuit applied Judge Friendly's reasoning in a suit by a member of a supervisor union against that union for violating its duty of fair representation. The court held that there was federal jurisdiction under § 301(a) to entertain the suit. 492 F.2d at 12. Finally, in *Isbrandtsen Co. v.*

---

**10.** *Marine Management*, a § 301 suit, cites four cases for the proposition that a public subdivision is not an employer for purposes of either the Wagner Act or the Taft-Hartley Act: *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971); *NLRB v. E. C. Atkins*, 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947); *NLRB v. Natchez Trace Electric Power Assoc.*, 476 F.2d 1042 (5th Cir. 1973); *NLRB v. Randolph Electric*, 343 F.2d 60 (4th Cir. 1965). All of these cases,

however, were suits under the Wagner Act and did not involve any cross reference from the Taft-Hartley Act to the Wagner Act definitions.

**11.** The amendment was in response to the holding in *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), that supervisors were employees for purposes of the Wagner Act. *See* H.R.Rep. No. 245, 80th Cong., 1st Sess. 14 (1947).

*Dist. 2, Marine Eng'rs Beneficial Ass'n,* 256 F.Supp. 68 (E.D.N.Y.1966), a supervisor union sued in state court to compel arbitration of a wage dispute. The employer petitioned for removal on the ground that the district court for the Eastern District of New York had jurisdiction under § 301(a), 29 U.S.C. § 185(a). The district court denied the union's motion to remand. It reasoned that Congress had a specific purpose in excluding supervisors from the jurisdiction of the National Labor Relations Board, but that it did not intend to exclude supervisors from suits under § 301(a) for violation of collective bargaining agreements. The *Isbrandtsen* case has been cited approvingly by the Second Circuit.[12]

Thus, at least two circuits in determining whether there is § 301(a) jurisdiction over a union look no further than the language "labor organization which represents employees in an industry affecting commerce", and disregard the cross reference in § 501(3) to a restrictive definition of employee or labor organization.[13]

Obviously the same technique of statutory construction could be used with respect to the definition of employer. That is, we might look not to the literal language of § 501(3) and § 2(2), but to the dominant intention of Congress in enacting the Labor Management Relations Act. If we perceive that the dominant intention was to cover all employers in industries where a labor dispute would burden or obstruct commerce or the free flow of commerce, we could conclude that the exclusion of political subdivision employers in § 2(2) was not intended to apply to both Acts. If we perceive that the dominant intention was to exclude totally from the reach of the national law of labor relations states and their political subdivisions, however, we should conclude that § 2(2) applies and that there is no § 301(a) jurisdiction. But as is so often the case, Congress has revealed its dominant intention with crystalline ambiguity.

We have not been referred to any legislative history in the eightieth Congress disclosing so much as a conscious decision respecting the status of state and political subdivisions under Titles II–V of the Taft-Hartley Act. The most that can be said is that the 1935 congressional decision excluding them from the coverage of the Wagner Act was carried forward. But that decision tells very little about the congressional intention with respect to the new titles. Congress in 1935 decided that it would not attempt to confer on public employees of the states a right to bargain collectively or to strike.[14] Undoubtedly, notions of states' rights and state sovereign immunity were instrumental in that decision. But it does not follow inevitably that by reiterating the decision to exclude state public employees from the coverage of Title I it also decided that the quite separate policies implicated by Titles II–V were to be inapplicable in those instances where state political subdivisions chose as a matter of state law to enter into collective bargaining relationships. Conceivably, the congressional intention which the court discovered in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), to create a federal common law of collective bargaining agreements included an intention to federalize the law respecting all such agreements with employers whose activities affect interstate commerce and are not covered by another federal statute,[15] whether or not the making of

---

12. *Nat'l Marine Eng'rs Beneficial Ass'n v. Globe Seaways, Inc.,* 451 F.2d 1159, 1160 n.1 (2d Cir. 1971).

13. The court in *Isbrandtsen* relied heavily on what it felt would be an inconsistency in the statute if a literal interpretation were adopted. "If it were intended that the definition sections [§ 2(3) of the Wagner Act and § 501(3) of the Taft-Hartley Act] were applicable automatical-

ly to LMRA § 301", the court reasoned, "the use of the phrase 'as defined in this Act' to modify 'industry affecting commerce,' would be superfluous." 256 F.Supp. at 76.

14. *See NLRB v. Natural Gas Utility District, supra,* 402 U.S. at 604 n.3, 91 S.Ct. 1746.

15. *See* note 2, *supra; Bell v. Chesapeake & Ohio Ry. Co.,* 58 F.R.D. 566 (S.D.Va.1973).

those agreements could have been coerced by the sanctions of the National Labor Relations Act. Conceivably, in other words, Congress may have intended to leave state political subdivisions free from the obligation to bargain collectively imposed by the Wagner Act, but to subject their voluntarily assumed collective bargaining undertakings, in industries affecting interstate commerce, to the new national law of labor agreements.

But while we must, to decide this case, finally say what we think Congress had in mind, the plain truth is that our legislators probably had no specific intention in 1947 respecting the applicability of § 301 to contracts with entities such as SEPTA. We deal not with the discovery of an actual intention, but with a speculative inquiry into what Congress would have intended had the issue before us been considered. That inquiry ought reasonably be related to the relevant considerations. Identifying them is our problem.

One method of identifying those considerations in the absence of legislative history is to assess the precedential consequences of attributing to Congress one or the other intention. What follows if we say that state political subdivisions, and the labor organizations representing their employees, are outside the coverage of the Labor Management Relations Act? What follows if we say they are covered? While this method may not guide us unerringly to the true collective intention of the eightieth Congress, at least it will expose the considerations which could lead us to a reasonable construction of the statute.

So then, if SEPTA and the Local are exempt, it follows:

(1) that there is no § 301(a) jurisdiction over either, as the district court held;

(2) that the provision in § 301(b) making the Local suable as an entity and bound by the acts of its agents is inapplicable, and the status of the Local is subject to the vagaries of state law; [16]

(3) that the provision in § 301(b) protecting the members of the Local from personal liability does not apply, and that state law could impose such liability; [17]

(4) that the services of the Federal Mediation and Conciliation services created by Title II may not be resorted to in a SEPTA labor dispute; [18]

(5) that the national emergency strike provisions of Title II are not available to the President in a SEPTA labor dispute; [19]

(6) that the restrictions in § 302 of Title III on payments to employee representatives who are officers of the Local would not apply; [20]

(7) that the Local could engage in a secondary boycott without fear of a damage suit brought pursuant to § 303(b); [21]

(8) that state not federal law measures the Local's duty of fair representation; [22]

(9) that state not federal law measures the parties' obligations under the collective bargaining agreement.[23]

If Crilly is right that SEPTA is an employer covered by the Taft-Hartley Act, none of the foregoing nine arguably

16. 29 U.S.C. § 185(b).

17. Id.

18. 29 U.S.C. §§ 172–173.

19. 29 U.S.C. §§ 176–180.

20. 29 U.S.C. § 186.

21. 29 U.S.C. § 187(b).

22. Thus cases such as *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) would not control in a suit in a state court.

23. Thus cases such as *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957), and *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), would not control in a suit in a state court.

adverse consequences follow, and a political subdivision of the Commonwealth may be subject to the jurisdiction of an Article III court against its wishes. SEPTA, on the other hand, urges that we should attach no significance to the nine consequences of its position because in the enlightened Commonwealth of Pennsylvania it can be sued in a state court and state law affords protection to it, to the Local, to the union members and to the public equivalent to that provided by the federal law derived from the Labor Management Relations Act. *See Pennsylvania Public Employee Relations Act,* 43 Pa.Stat.Ann. § 1101.101 *et seq.* (Supp.1975). That argument is beside the point, however, for the exemption it urges would be equally available to the political subdivisions of the most unenlightened jurisdiction.

Despite the practical attraction of Crilly's proposed statutory interpretation, we are convinced by other evidence that Congress probably did intend to exclude state and local government employees from the coverage of the Taft-Hartley Act. Unlike the supervisor cases, the original Wagner Act definition of employer explicitly excluded states and political subdivisions. Therefore, we do not have a statutory ambiguity of the magnitude which justified Judge Friendly's dominant legislative purpose analysis. In addition, the exemption of state and political subdivisions has been evident in other pieces of federal labor legislation.[24] When Congress has decided to extend coverage of other federal labor legislation to public employees, it has specifically amended the definition of employer to include states and political subdivisions.[25] Another technique Congress has chosen in dealing with employees in the public sector is to enact a separate statute and model it after the Labor Management Relations Act.[26] Had Congress intended that state and political subdivisions be covered by the Taft-Hartley Act, when engaging in activities affecting interstate commerce, it could have done so explicitly by means of one of these techniques.[27] Finally, the very question of extending the coverage of the Labor Management Relations Act to public employees is now before the ninety-fourth Congress.[28] The major impetus behind this proposed legislation is the apparent consensus of congressional and public employee union opinion that nei-

**24.** *See* § 3(d) of the Fair Labor Standards Act of 1938, ch. 676, 52 Stat. 1060 (1938), as amended, 29 U.S.C. § 203(d) (Supp.1975), and § 3(e) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 402(e).

**25.** Section 3(d) of the Fair Labor Standards Act of 1938 was amended in 1966 to include public employees in hospitals, institutions, and schools, Pub.L. 89–601, § 102(b), 80 Stat. 831 (1966), and again in 1974 to include all public employees, Pub.L. 93–259, § 6(a)(1), 88 Stat. 58 (1974). The constitutionality of these amendments to 29 U.S.C. § 203(d) has been upheld in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (1966 amendment), and in *The Nat'l League of Cities v. Brennan,* Civil No. (D.C. D.C. Dec. 31, 1974), *prob. juris. noted,* 43 U.S.L.W. 3036, 420 U.S. 906, 95 S.Ct. 823, 42 L.Ed.2d 835 (1975) (1974 amendment), and *California v. Brennan,* Civil No. (D.C. D.C. Dec. 31, 1974), *prob. juris. noted,* 43 U.S.L.W. 3037, 420 U.S. 906, 95 S.Ct. 823, 42 L.Ed.2d 835 (1975) (1974 amendment).

**26.** *See, e. g.,* Postal Reorganization Act of 1970, 39 U.S.C. § 101 et seq. (Supp.1972).

**27.** One other technique Congress has chosen in handling this problem is to indicate that a special definition governs a particular subsection of the labor legislation. For example, § 304 of Title III of the Taft-Hartley Act amended § 313 of the Federal Corrupt Practices Act, 2 U.S.C. § 251, to restrict the political contributions of corporations and labor organizations. This section reads in pertinent part as follows:

> For the purposes of this section "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

But this definition is virtually identical to the definition of labor organization in § 2(5) of the Wagner Act. Probably Congress intended that the definition in § 304 should not be dependent upon the restrictive definition of employer in § 2(2) of the Wagner Act although it has failed to convey this intention unambiguously. Section 304 now appears at 18 U.S.C. § 610.

**28.** *See* note 6 *supra.*

ther the Wagner Act nor the Taft-Hartley Act covers public employees.[29]

There is insufficient evidence in either past or present legislative history for this court to find that Congress would have included public employees within the provisions of the Taft-Hartley Act if it had specifically considered the problem. We are inclined to believe that the legislative silence during the passage of the Taft-Hartley Act with reference to the carrying forward of the exemption for states and political subdivisions, if it meant anything, meant approval of the exemption. Thus, until Congress expressly changes the definition of employer in § 2(2) of the Wagner Act to include states and political subdivisions, or provides a new definition in the Taft-Hartley Act, we will adhere to the literal language of the definition just as we have done with reference to the exemption in the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* (1970). *See, e. g., Local 1498, American Fed'n of Government Employees v. American Fed'n of Government Employees, AFL–CIO,* 522 F.2d 486 (3d Cir. 1975); *New Jersey County and Municipal Council # 61 v. American Fed'n of State, County and Municipal Employees,* 478 F.2d 1156, 1160 (3d Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973).

If we were legislators, we might want to extend coverage for the reasons already discussed. But we recognize that in the final analysis the issue in this case presents a legislative not a judicial problem, and we therefore defer to future congressional consideration.

The judgment of the district court will be affirmed.

**29.** *See, e. g.,* 120 Cong.Rec. S. 5001 (April 2, 1974) (remarks of Senator Williams); Senate Hearings, *supra* note 8, at 2 (Senator Williams); 47 (Senator Taft); 122 (statement of James A. Harris, President, National Educational Association); 145 (statement of Jerry Wurf, President, American Federation of State, County, and Municipal Employees); 271 (statement of Albert Shanker, President, American Federation of Teachers). *See also* *N.Y. Times,* October 8, 1974, at 24, col. 4. It should be noted that various spokesmen erroneously referred to the Taft-Hartley Act as the National Labor Relations Act during these hearings.