Edward MAJEWSKI, Executive of the Estate of Albert Z. Elkes, Appellant

v.

B'NAI B'RITH INTERNATIONAL.

No. 82–1744.

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1983.

Decided Nov. 15, 1983.

As Amended Nov. 23, 1983.

Robert B. Fitzpatrick, Washington, D.C., for appellant.

Mozart G. Ratner, Washington, D.C., for appellee.

Before ROBINSON, Chief Judge, TAMM, Circuit Judge, and GORDON,* Senior District Judge for the Western District of Kentucky.

Opinion for the Court filed by Senior District Judge JAMES F. GORDON.

JAMES F. GORDON, Senior District Judge:

This case presents the question whether an action alleging a breach of a collective bargaining agreement between an employer and a supervisory union can be based on local law or must be brought under § 301(a) of the federal Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a) (1976). The appellant's decedent tried to maintain this suit as a diversity action that could be resolved under local contract law. The district court, however, held that the suit was preempted by § 301(a) and dismissed the action. We affirm.

I.

Albert Elkes left B'nai B'rith International (BBI) at the end of 1977 following a staff reassignment earlier that year which

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

824

he declined to accept.[1] In December, 1979, Elkes first asserted that the reassignment represented a constructive discharge and that he was entitled to severance pay under the provisions of a bargaining agreement between BBI and its staff association. The staff association was the exclusive bargaining agent for a unit that appellant alleges contained only supervisory and managerial workers.[2]

After BBI responded that his request was frivolous, Elkes sought to have the staff association arbitrate his grievance with BBI. The association's executive committee voted on June 3, 1980, against taking his grievance to arbitration. However, Elkes was told by letter that day that he could appeal the executive committee's refusal to the full membership of the association, pursuant to its constitution. Instead, Elkes again wrote BBI's president on June 6, 1980, asserting a right to present his grievance personally or proceed to arbitration.

He repeated those contentions in a letter dated July 24, 1980, but was told over the phone on August 1, 1980, that BBI would not process his grievance further. On December 31, 1980,[3] Elkes brought a breach of contract suit for $36,500, alleging that the action could be heard under the district court's diversity jurisdiction, and should be governed by local law.[4]

Initially, the district court granted a discovery request aimed at determining the precise composition of the association. Later, however, the court ruled that even if the association was composed entirely of supervisory and managerial workers, § 301(a) preempted the action.[5] The district court also indicated that had the suit been brought under § 301(a), it would have had to be dismissed because of Elkes's failure to exhaust his grievance remedies.[6]

The appellant continues to plead, however, that § 301(a) is inapplicable because it only pertains to agreements involving "a

---

1. After he was reassigned and while he was considering leaving, Elkes negotiated a retainer agreement with BBI through which he was paid $1000 a month for two years following his departure. Under the agreement, Elkes was to provide consultation services two days a week on audiovisual topics. There have been no allegations that BBI breached the retainer agreement.

2. The district court did not resolve the issue of the staff association's actual composition. BBI contended that up to 30 percent of the association consisted of employees without "managerial" or "supervisory" authority, including a number of "professional" employees specifically covered by the LMRA, 29 U.S.C. § 152(12).

3. A host of unresolved issues exist over whether Elkes's actions were timely, including whether he originally brought his grievance too late and whether he brought this action more than six months after he had exhausted his grievance remedies, see DelCostello v. International Brotherhood of Teamsters, —— U.S. ——, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (establishing that grievants have six months to bring § 301 actions after exhausting their remedies). We need not resolve these issues because the appellant has never sought to present this claim as one arising under § 301.

Nor is this a case where, having found that § 301(a) preempts appellant's action, we should simply "recharacterize" the complaint as one arising under § 301. Elkes was not a pro se claimant who inadvertently ran afoul of

federal preemption principles, as in Fristoe v. Reynolds Metals Co., 615 F.2d 1209 (9th Cir. 1980). Rather, there are serious doubts whether he exhausted his grievance remedies as required by § 301(a), or did so in a timely fashion. Instead of confronting these potential barriers, Elkes appears to have made an informed decision to try to invoke our diversity rather than our federal question jurisdiction.

4. Mr. Elkes died during the pendency of this appeal and we have granted a motion by the executor of his estate to be substituted as appellant.

5. The section provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

6. "Ordinarily, ... an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. Republic Steel Corp. v. Maddox, 379 U.S. 650 [85 S.Ct. 614, 13 L.Ed.2d 580] (1965); cf. Clayton v. Automobile Workers, 451 U.S. 679 [101 S.Ct. 2088, 68 L.Ed.2d 538] (1981)." DelCostello, supra note 3, 103 S.Ct. at 2290.

labor organization representing employees." This excludes the association's agreements, the appellant contends, because the association itself is allegedly composed only of supervisory and managerial workers, not statutory "employees." The appellant relies for his definition of "employees" on § 2(3) of the LMRA, 29 U.S.C. § 152(3), which provides that "[t]he term 'employee' ... shall not include ... any individual employed as a supervisor." That definition is apparently made applicable throughout the LMRA, including § 301(a), by § 501(3), 29 U.S.C. § 142(3).[7] Additionally, the LMRA has been held not to cover the labor activities of managerial workers, *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

## II.

Our resolution of this case hinges on an understanding of what Congress meant when it enacted the supervisory exclusion in § 2(3). The exclusion stems from the special problem that supervisory workers present in the collective bargaining setting, as discussed in *Florida Power & Light Co. v. International Brotherhood of Electrical Workers, Local 641,* 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). On one hand, supervisors are customarily given authority by their employers to hire, fire, discipline and manage other employees, and are assumed to be acting in their employer's best interests. On the other hand, however, when supervisors organize—and particular-

ly when they affiliate with unions composed of rank and file workers—they become subject to influence or control by labor representatives who will have different goals than the employers.

The resulting conflict in loyalties caused initial uncertainty over whether to include supervisors within the organizational and bargaining protections of the original National Labor Relations Act. Following the Supreme Court's decision to interpret the Act as covering supervisors in *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), Congress adopted § 2(3) in 1947 to exclude supervisors from the rewritten LMRA.

> Congress' solution was essentially one of providing the employer with an option. On the one hand, he is at liberty to demand absolute loyalty from his supervisory personnel by insisting, on pain of discharge, that they neither participate in, nor retain membership in, a labor union, see *Beasley v. Food Fair of North Carolina, Inc.,* [416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974)]. Alternatively, an employer who wishes to do so can permit his supervisors to join or retain their membership in labor unions, *resolving such conflicts as arise through the traditional procedures of collective bargaining.*

*Florida Power & Light,* 417 U.S. at 812–13, 94 S.Ct. at 2748–49 (emphasis added).

---

7. That section provides: "When used in this chapter [the LMRA in its entirety, including § 301(a)]—(3) The terms ... 'employee', 'labor organization', ... and 'supervisor' shall have the same meaning as when used in subchapter II [where § 2(3) is contained]." Probably the best explanation for the inclusion of that section is that § 301(a) was drafted to be read in connection with the original Senate provision making it an unfair labor practice to breach a collective bargaining agreement. Had that latter provision been adopted, the section quoted above would have insured that courts hearing § 301 suits would feel compelled to apply the same jurisdictional criteria the NLRB uses in determining its authority to regulate unfair labor practices. However, because the Senate provision was abandoned, the possibility of this particular conflict over jurisdiction no

longer exists. *See* Recent Decisions, Labor Law—Union Representing Supervisory Employees Is a "Labor Organization Representing Employees" Within the Meaning of Section 301(a) of the Labor Management Relations Act, 42 Notre Dame Lawyer 534, 539–40 (1967).

Concededly, our decision today may evoke images of Alice in Wonderland's frustrations with Humpty Dumpty (" 'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.' "). *But see Environmental Defense Fund, Inc. v. Costle,* 631 F.2d 922, 927 (D.C.Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981) (quoted with approval in *Buttrey v. United States,* 690 F.2d 1170, 1175 (5th Cir.1982) ) (recognizing that "it is possible for a term to have different meanings, even in the same statute").

The appellant argues that § 2(3) extends to prevent supervisors' agreements from being enforceable under § 301(a) as other union agreements are. That argument was first made over two decades ago, and initially was successful before a panel of this court.[8] But for more than a dozen years now, district and appellate courts have uniformly concluded that § 301 does apply to agreements involving labor organizations that contain supervisors, despite the apparent conflict with the statutory language, because "[t]he particular definition of 'employee' in § 2(3) . . . has nothing to do with § 301(a) federal jurisdiction." *District 2, Marine Engineers Beneficial Ass'n v. Grand Bassa Tankers,* 663 F.2d 392, 398 n. 6 (2d Cir.1981).[9]

Some courts have reached this conclusion after reading the legislative history of the LMRA as expressly limiting § 2(3)'s definition to a section of the statute that does not include § 301.[10] At the least, our own review suggests that Congress probably never considered the issue before us. There are at least two explanations for this. First, it apparently was thought that once the 1947 amendments took effect and removed any obligation for employers to bargain with supervisors, that few agreements would ever be negotiated and there would never be any occasion for § 301(a) enforcement.[11] Second and more significant, relatively little thought went into § 301's scope because few people imagined that it would ever evolve into the profoundly important source of law it has come to be. Originally, the chief purpose of the national labor laws was simply to set forth the ground rules regulating the adversarial relationship between management and labor. Only in recent years has § 301 been broadly interpreted to embody a "national labor policy" that seeks to promote grievance and arbitration procedures and encourage "private rather than judicial resolution of disputes arising over collective bargaining agreements." *Clayton v. Automobile Workers,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981).

It is this larger role § 301 has come to play that dooms appellant's statutory interpretation. Nothing about supervisors' conflicts of loyalty can justify treating their bargaining agreements differently from agreements negotiated by other employees.[12] Instead, with federal labor policy

---

**8.** *See International Organization of Masters, Mates and Pilots v. NLRB,* 351 F.2d 771, 775 (D.C.Cir.1965), where the court remarked in dictum that "it may well be" that an agreement entered into by a bargaining unit containing no statutory employees would be unenforceable under § 301 "since that section deals only with 'contracts between an employer and a labor organization *representing employees.'*" (Emphasis in original).

*See also A.H. Bull Steamship Co. v. National Marine Engineers' Beneficial Ass'n,* 250 F.2d 332 (2d Cir.1957), *cert. denied,* 355 U.S. 932, 78 S.Ct. 411, 2 L.Ed.2d 414 (1958), overruled implicitly in *United States v. National Marine Engineers Beneficial Ass'n,* 294 F.2d 385 (2d Cir.1961), and explicitly in *National Marine Engineers Beneficial Ass'n v. Globe Seaways, Inc.,* 451 F.2d 1159, 1160 n. 1 (2d Cir.1971); *Retail Clerks, Local 330 v. Lake Hills Drug Co.,* 255 F.Supp. 910 (W.D.Wash.1964), overruled by *Dente v. Masters, Mates and Pilots,* 492 F.2d 10, 12 (9th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

**9.** In addition to the cases cited in note 8 *supra,* see *District 2, Marine Engineers Beneficial Ass'n v. Amoco Oil Co.,* 554 F.2d 774 (6th Cir.1977); *Crilly v. Southeastern Pennsylvania*

*Transportation Authority,* 529 F.2d 1355, 1359–60 (3d Cir.1976); *United Steelworkers of America v. Indiana & Michigan Electric Co.,* 483 F.Supp. 330 (S.D.W.Va.1977); *Isbrandtsen Co. v. District 2, Marine Engineers Beneficial Ass'n,* 256 F.Supp. 68 (E.D.N.Y.1966).

**10.** *District 2, Marine Engineers Beneficial Ass'n v. Amoco Oil Co.,* 554 F.2d 774, 777 (6th Cir. 1977) ("The legislative history of the Labor-Management Relations Act makes it abundantly clear that Congress wished to insulate an employer's interaction with its supervisors from only those constraints imposed by Title I.")

**11.** *See* Recent Decisions, *supra* note 7, at 540.

**12.** This is also not the type of lawsuit that must be left to local law under the Supreme Court's preemption analysis, for it cannot be said that an action alleging a breach of a collective bargaining agreement "is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that" we should defer to state regulation. *Local 926, International Union of Operating Engineers v. Jones,* —— U.S. ——, ——, 103 S.Ct. 1453, 1459, 75 L.Ed.2d 368 (1983) (holding

and the LMRA itself [13] now recognized as favoring private resolution of labor disputes, BBI's agreement must be treated like every other "collective-bargaining agreement [that] is much more than traditional common law employment at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy." *Bowen v. United States Postal Service*, —— U.S. ——, ——, 103 S.Ct. 588, 594, 74 L.Ed.2d 402 (1983).

Among the federal interests implicated by appellant's suit are concerns that bargaining agreements be enforceable and that grievance procedures be undergirded by judicial deference to the grievance process. The appellant's statutory interpretation would threaten both of these concerns, however. If this claim were adjudicated under local law, BBI's agreement might well be unenforceable or subject to widely varying local statutes and court interpretations.[14] Even if the agreement were given effect, there would be no assurance that employees would be required to exhaust their grievance remedies in a timely fashion before turning to the courts.

In fact, appellant's suit vividly illustrates the problems with his argument. Elkes did not raise his grievance until two years after the events giving rise to his complaint. Even then, he did not pursue the grievance through all the channels adopted by his bargaining agent. Yet it has never been alleged that his agent should be liable for unfair representation. We conclude that the appellant cannot escape federal labor policy by trying to have this claim adjudicated under local law through our diversity jurisdiction. We hold that the staff association was a "labor organization representing employees" within the scope of § 301(a), and we AFFIRM the district court's dismissal.

a state suit for interference with contractual relations preempted by the Labor Management Relations Act).

**13.** The LMRA expressly provides that "[f]inal adjustment by a method agreed upon by the parties is declared to be the most desirable method for settlement of grievance disputes arising over the application of interpretation of an existing collective bargaining agreement." § 203(d), 29 U.S.C. § 173(d).

**14.** Before § 301 was enacted, employers often had difficulty suing unions, which were unincorporated voluntary associations. This proved particularly controversial when employers were unable to enforce no-strike clauses. Even when collective bargaining agreements could be sued upon, problems arose because of varying local interpretations of contract provisions. These problems were addressed relatively early in the development of § 301 law in *Teamsters Local v. Lucas Flour Co.*, 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962), where the Court discussed several concerns which might arise were we to allow the appellant to maintain this action under local law:

[T]he subject matter of § 301(a) is "peculiarly one that calls for uniform law." (Citations omitted.) The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.... Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation. Indeed, the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling. The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy.